**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
TYRONE BENNETT,

                    Plaintiff,

                                                              **MEMORANDUM OF**
          -against-                                           **DECISION AND ORDER**
                                                              10-CV-2195 (ADS)(ARL)
HOFSTRA UNIVERSITY,

                    Defendant.
--------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Wolf & Wolf LLP**
*Attorneys for the plaintiff*
910 Grand Concourse, Suite 1F
Bronx, NY 10451
    By: Jason M. Wolf, Esq., Of Counsel

**Orrick, Herrington & Sutcliffe LLP**
*Attorneys for the defendant*
51 West 52nd Street
New York, NY 10019
    By: Jill L. Rosenberg, Esq., Of Counsel

**SPATT, District Judge**.

    Tyrone Bennett ("Bennett" or "the Plaintiff") commenced this action against his former

employer Hofstra University ("Hofstra" or "the Defendant") alleging that he was terminated by

Hofstra based on his gender and in retaliation for complaining about discrimination in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VI") and the New

York Human Rights Law, N.Y. Exec. Law § 296, *et seq.* ("NYHRL"). Presently before the

Court is the Defendant's motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56(c) ("Fed. R. Civ. P. 56") to dismiss the complaint in its entirety. For the reasons

set forth below, the Defendant's motion is granted.

1

# I.  BACKGROUND

The following facts are drawn from the parties' submissions in this case.  Because the Defendant has brought this motion for summary judgment, any inferences that the Court draws from the facts as presented are viewed in the light most favorable to the Plaintiff.

## A.  The Parties

On August 21, 2006, the plaintiff Tyrone Bennett was hired by the defendant Hofstra University for an at-will employment position of Associate Director of the Collegiate Science and Technology Entry Program ("CSTEP").  CSTEP is a program that receives 100% of its funding from the New York State Education Department ("NYSED").  It's primary goal is to increase the number and quality of historically underrepresented groups in careers related to science, technology, engineering, mathematics, and licensed professions.  At all relevant times during his employment, Bennett was supervised by Dr. Anthony Robinson ("Dr. Robinson"), Assistant Dean in the School of Education, Health and Human Services and Director of the Center for Educational Access and Success ("CEAS").

In his capacity as Associate Director, Bennett's responsibilities included, but were not limited to administering, coordinating, developing and managing activities for CSTEP relative to the goals of the grant.  There is no dispute that Dr. Robinson had the authority to supplement or alter these responsibilities.  As set forth below, from shortly after he was hired until his termination on May 11, 2009, Bennett and Dr. Robinson engaged in a number of disputes involving Bennett's attendance record; management of the CSTEP budget; and ability to work with Dr. Robinson.  Throughout the course of these disputes, Bennett registered a number of complaints with Dr. Robinson and Hofstra about Dr. Robinson's performance as a supervisor and his behavior towards CSTEP students and the CSTEP generally.

**B.  Dispute over Bennett's Attendance Record**

In his capacity as Bennett's supervisor, Bennett, and other employees in CEAS, were required to notify Dr. Robinson in advance if they were going to be late to work; needed to leave early; were going to be away from the CEAS office; or were going to be absent.

On March 13, 2007, Dr. Robinson met with Bennett.  According to Hofstra, the purpose of this meeting was to discuss, among other things, numerous absences by Bennett.  Subsequent to the meeting, Dr. Robinson provided Bennett with a written Incident Report outlining the areas of concern discussed at the meeting.  (Rosenberg Decl., Ex. 9.)  Bennett disputes that multiple absences were discussed, and contends it was limited to one absence.

Bennett and Dr. Robinson met again on April 17, 2007, at which time Dr. Robinson provided Bennett with a letter concerning his attendance.  In the April 17, 2007 letter, Dr. Robinson identified two instances after the March 13, 2007 meeting in which Bennett had been absent without providing Dr. Robinson with the requisite notice.  (Rosenberg Decl., Ex. 10.)  In response to the April 17, 2007 letter, on April 18, 2007, Bennett sent a letter to Hofstra outlining a number of grievances with Dr. Robinson's performance as his supervisor, and disputing one of the two absences highlighted by Dr. Robinson in the April 17, 2007 letter.  (Rosenberg Decl., Ex. 11.)  On May 1, 2007, Dr. Robinson sent Bennett a revised version of the April 17, 2007 letter, removing the reference to the disputed absence.  (Rosenberg Decl., Ex. 12.)  On May 10, 2007, Bennett sent another letter to Hofstra criticizing Dr. Robinson, writing, among other things, that Dr. Robinson "has performed under expectations and administered neglect to key staff members," and has shown a "lack of judgment in a supervisory role".  (Rosenberg Decl., Ex. 13.)

Subsequent to Bennett's May 10, 2007 letter, on an unspecified date, a meeting was held between Dr. Robinson, Dr. Maureen Murphy, the Interim Dean of the School of Education,

Health and Human Services, and Bennett. The parties have differing accounts of what occurred at this meeting. According to Hofstra, this meeting was held to discuss Bennett's attendance problems, and at the end of the meeting, Bennett apologized to Dr. Robinson and Dean Murphy. On his part, Bennett contends that the meeting was held to discuss his complaints against Dr. Robinson raised in his April 18, 2007 and May 10, 2007 letters. Bennett further contends that he corrected Dr. Robinson about his number of absences, and that he did not apologize at the end of the meeting. Despite the alleged problems with absences, Dr. Robinson gave Bennett a positive performance review for 2007–2008 school year.

**C. The Dispute Over Bennett's Management of the CSTEP Budget**

The relationship between Bennett and Dr. Robinson took a turn for the worse in the fall of 2008, when Bennett, as well as other CEAS employees responsible for grant-funded programs, were assigned the additional task of preparing and monitoring the budget for their respective programs. In preparation for this new task, Bennett and the other affected employees attended a two-day training program from August 18–19, 2008. The training was conducted by Martha Giraldo-Riordan (also referred to as "Martha Giraldo or "Martha Riordan" and hereinafter referred to as "Riordan").

After receiving training in Hofstra budget procedures, Bennett subsequently entered into an agreement with a vendor called The Frink Group to purchase sweatshirts for CSTEP students. Although he obtained approval from Dr. Robinson with regard to the logo for the sweatshirts, Bennett did not follow Hofstra procedure in entering into the agreement with The Frink Group because he did not obtain prior written approval from Dr. Robinson. In addition, Hofstra contends, and Bennett disputes, that Bennett made a mistake in selecting the expense category where the sweatshirts were supposed to be entered. Nevertheless, Bennett does not dispute that

he made an error with the sweatshirts and the budget, and that his error resulted in a $3,000 shortfall in the CSTEP account.  As result, Hofstra had to obtain approval from the NYSED to reallocate funds in the budget in order to cover the shortfall.

On April 1, 2009, a representative from The Frink Group sent a letter to Dr. Robinson and Bennett stating that the invoice for the sweatshirts had not been paid; assessing a late fee; and threatening legal action if payment was not received within 30 days.  Although the parties dispute who is to blame for the delay in obtaining the additional funds to cover the sweatshirts and the lack of communication with The Frink Group, there is no dispute that this letter stemmed from Bennett's initial error in entering into the contract prior to obtaining the requisite approval.

## D.  The Dispute Over Bennett's Ability to Work with Dr. Robinson

According to Hofstra, from the fall of 2008 through the first quarter of 2009, Dr. Robinson had a number of written and verbal communications with Bennett about his performance.  During the period from April 3rd to April 5th 2009, Bennett, CSTEP students, and Dr. Robinson attended a statewide conference at the Sagamore ("the CSTEP Sagamore Conference").  Prior to the conference, Bennett and Dr. Robinson traded correspondence about the transportation and lodging arrangements.  To the extent there is any dispute over whether these arrangements were made efficiently and in compliance with Hofstra policies, both parties blame the other.

Following the CSTEP Sagamore Conference, on April 16, 2009, Bennett sent Dr. Robinson an email reporting three complaints he had received from students about Dr. Robinson's behavior towards them at the conference, and criticizing Dr. Robinson's leadership skills ("the April 16, 2009 email").  (Rosenberg Decl., Ex. 20.)

Subsequently, also on April 16, 2009, a meeting was held between Dr. Robinson, Bennett, and Lillian Colella, the Associate Director of Human Resources, at which time concerns about Bennett's job performance and attendance were discussed. Bennett contends that he thought the April 16, 2009 meeting was one of his regularly scheduled meetings with Dr. Robinson about CSTEP, and was blindsided by the discussion of his job performance. Hofstra asserts, and Bennett denies, that Bennett was upset during the meeting and interrupted Dr. Robinson's attempt to discuss his job performance. However, Bennett admits that Ms. Colella ended the meeting after forty minutes.

Dr. Robinson memorialized the April 16, 2009 meeting in an April 20, 2009 memorandum to Bennett, with copies to Ms. Colella and Dr. David Foulk, Dean of the School of Education, Health and Human Services. This memorandum was provided to Bennett at a meeting on April 24, 2009. In addition to discussing Bennett's alleged performance and attendance issues, this memorandum set forth a Plan of Action for Bennett, which included encouraging Bennett to take a number of steps to improve his performance and encouraging him to "notify [Dr. Robinson] in advance of all [CSTEP] plans and meetings with students and organizations". (Rosenberg Decl., Ex. 14.) The memorandum concluded with the following warning: "Please understand that further disciplinary action, up to an including termination of your employment will result if your work performance does not improve." (Id.)

As indicated on the memorandum, Bennett refused to sign the document. According to Bennett, at the April 24, 2009 meeting, Dr. Robinson informed him that "[he] was not to have any dealings with the CSTEP program or any of its students until further written notice". (Bennett Aff., ¶ 9.) Although Bennett admits that this understanding contradicts what is stated in

the memorandum's Plan of Action, he claims in his affidavit that he did not have an opportunity to thoroughly review the memorandum.

Approximately an hour after his April 24 meeting with Dr. Robinson, Bennett sent an email to the Hofstra CSTEP students, and various Hofstra faculty, staff and outside vendors associated with CEAS and CSTEP stating the following:

> Dear CSTEP students, Consultants and friends: As per Dr. Anthony Robinson, Assistant/Dean/Executive Director instructions placed at 2:28 pm I Tyrone Bennett, Associate Director of CSTEP will not have anything dealings with the Hofstra University CSTEP program its students until further written notice. All inquiries must be given to him.

("the April 24, 2009 mass email", Rosenberg Decl., Ex. 18.) Bennett asserts that he sent this email because "[t]he idea of speaking to each student and faculty member regarding Robinson's hands-off order seemed exhaustive" and he "thought the email was the most efficient manner of communicating the change in policy". (Bennett Aff., ¶ 10.) Although Bennett did not notify Dr. Robinson or seek his approval prior to sending the email, Bennett contends that there was no policy or procedure requiring him to obtain approval prior to sending the email.

Upon receipt of the email, Dr. Robinson sent the following email reply to Bennett, with copies to Ms. Colella and Dean Foulk:

> I am in receipt of your email. I do not understand why you sent this email, nor do I understand why you sent it to the [CSTEP] Community (students, staff and faculty). At no time did I give you instructions to stop working with the CSTEP Community. As note [sic] in the memorandum, I advised you to 'notify me in advance of [CSTEP] plans and meetings with students and organizations.' I will meet with you on Monday, April 27, 2009 to follow-up.

(Rosenberg Decl., Ex. 19.)

On April 27, 2009, Plaintiff sent to following email to Dr. Robinson, with a copy to Dean Foulk:

> Due to the level by which I was misinterpreted on April 16, and the misrepresentations of facts April 24, 2009, I have alerted the Dean that I cannot meet with you for any further meetings unless there is a mediator present. I suggested Dean Spencer or Levinson, but it is the Dean's choice in the selection of whom.

(Rosenberg Decl., Ex. 20.)

The parties dispute whether a meeting between Bennett and Dr. Robinson was still scheduled for April 27, 2009. However, neither party disputes that no meeting took place. However, on April 27, 2009, Bennett did have an in person meeting with Dean Foulk, at which he stated that he felt "Dr. Robinson's actions were predicated on gender discrimination and that [he] was being treated differently that [his] similarly situated female counterparts". (Bennett Aff., ¶ 12.) According to Bennett, Dean Foulk instructed him to rebut Dr. Robinson's accusations in writing and to schedule a meeting with Dr. Robinson and Ms. Colella.

Bennett submitted to Dr. Robinson a memorandum titled "Rebuttal – Work Performance Memorandum dated April 20, 2009", with copies to Dean Foulk and Ms. Colella ("the Rebuttal Memorandum"). (Rosenberg Decl., Ex. 21.) Although the memorandum was dated April 29, 2009, it was delivered to Dr. Robinson on May 11, 2009, and to Ms. Colella and Dean Foulk on May 7, 2009. In the Rebuttal Memorandum, Bennett notes that he had received position work performance reviews for himself and CSTEP for the 2007–2008 school year and disputed Dr. Robinson's characterization of his attendance record. With respect to Dr. Robinson's allegations about his negative performance in handling the budget and other administrative tasks for CSTEP, Bennett contended that "contracts, budgets, conference hotel reservations and/or any other task that are under clerical duties", were not part of his job description, and were Dr. Robinson's responsibility as executive director. (Id.) Bennett specifically addressed Dr. Robinson's behavior at the CSTEP Sagamore Conference and other alleged "inappropriate behaviors",

stating: "It is clear that your actions are chronic signs of insecurity and lack of management skills in terms of directing this center". (Id.)

## E. Bennett's Termination

On April 29, 2009, Dr. Robinson sent an email to Dean Foulk and Evelyn Miller-Suber, Hofstra's Director of Human Resources, recommending that Bennett be removed from CEAS and given another non-CSTEP assignment or project until his grant ended on June 30, 2009. (Rosenberg Decl., Ex. 26.) Dr. Robinson's email cited several reasons for his recommendation, including, Bennett's April 24, 2009 mass email; Bennett's budgetary errors; and Bennett's statement in his April 27, 2009 email that he was unwilling to meet with Dr. Robinson without a mediator, which Dr. Robinson claimed "essentially limit[ed] [his] capacity to function as a director" and the programs ability to meet NYSED guidelines. (Id.)

On May 7, 2009, Dean Foulk sent a memorandum to Dr. Herman Berliner, Hofstra's Provost, recommending the immediate termination of Bennett effective May 11, 2009. Dean Foulk's memorandum cited several reasons for his recommendation, including, Bennett's insubordination at the April 16, 2009 meeting; the April 24, 2009 mass email; and Bennett's "refus[al] to meet with his supervisor except under conditions set forth by [Bennett]." (Robinson Decl., Ex. 3.)

Bennett was notified of his termination in a meeting with Dr. Robinson on May 11, 2009. On May 20, 2009, Bennett sent a letter to Stuart Rabinowitz, Hofstra's President, attaching a copy of the Rebuttal Memorandum, and writing, among other things, that he "believe[d] . . . the true reason for [his] termination" to be the result of his April 16, 2009 email to Dr. Robinson concerning Dr. Robinson's interactions with students at the CSTEP Sagamore Conference. (Robinson Decl., Ex. 23.)

**F.  The Instant Action**

On June 15, 2009, Bennett timely filed a Charge of Discrimination with the Equal

Employment Opportunity Commission, and received a Right to Sue letter on March 31, 2010.

Subsequently, on May 13, 2010, Bennett commenced the instant action against Hofstra asserting

causes of action for gender discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, and the New York State Human Rights Law,

N.Y. Executive Law § 296 *et. seq.*  Although the causes of action are asserted against Hofstra,

Bennett alleges that all acts of discrimination and retaliation were taken by Dr. Robinson.

On August 2, 2011, Hofstra brought the instant motion for summary judgment seeking

dismissal of the complaint in its entirety.  The Court will address the motion with respect to the

gender discrimination and retaliation claims separately.

.

## II.  DISCUSSION

**A.  Legal Standard**

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). A fact is "material"

within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the

suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L. Ed. 2d 202 (1986).  An issue is "genuine" when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  Id.  In determining whether an

issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits,

interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586, 106 S. Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

## B.  As to the Plaintiff's Gender Discrimination Claims

The Plaintiff has asserted discrimination claims on the basis of gender under Title VII and the New York Human Rights Law.  Both of these claims are analyzed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  See Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009).  To succeed on a claim of employment discrimination, the Plaintiff must first establish a prima facie case of discrimination.  Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010).  To do this, the Plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.  Id. at 491–92; see also Leibowitz, 584 F.3d at 498.  With regard to the fourth prong of this test, the

Second Circuit has held that an inference of discrimination may be drawn either from (1) direct evidence of discriminatory intent, or (2) a showing by the Plaintiff that "[he] was subjected to disparate treatment ... [compared to persons] similarly situated in all material respects to ... [himself]." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (internal quotations and citations omitted).

Here, the parties agree that the Plaintiff can satisfy the first three prongs of the prima facie case for discrimination. However, the Defendant argues that the Plaintiff cannot show that his termination "occurred under circumstances giving rise to an inference of discrimination." The Court agrees.

The Plaintiff asserts in his affidavit that Dr. Robinson "would easily instill fear in [his] female counterparts whereas [he] would not back down" and that it was his "stubbornness in the face of [Dr. Robinson's] ineptitude as well as [his] gender which led to [his] termination". (Bennett Aff., ¶ 13.) However, the Plaintiff does not present any direct evidence of discriminatory intent. Rather, in attempting to show there are genuine issues of fact with respect to this fourth prong, the Plaintiff argues that a reasonable juror could find a prima facie case of gender discrimination based on the fact that his similarly situated female co-workers, "were left alone when they made mistakes" but when the Plaintiff made errors "Robinson tortured and berated [him] on a daily basis". (Bennett Aff., ¶ 3–4.)

Generally, the Plaintiff's burden in establishing a prima facie case of discrimination under Title VII is "minimal." Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000). It is also generally a "question of fact for the jury" as to whether a person is similarly situated to the plaintiff in a discrimination case. Graham, 230 F.3d at 39. Nevertheless, the Second Circuit has held that to establish a prima facie case of employment discrimination based on disparate

treatment, a plaintiff must be able to show that: (1) his putative comparators "were subject to the same performance evaluation and discipline standards" and (2) "the conduct [of the putative comparator] for which the employer imposed discipline was of comparable seriousness." Id. at 40 (citing Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999)). In addition, there must be a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." Id.

In the complaint, the Plaintiff identifies his similarly situated female co-workers as Sabita Nayak the Associate Director for the Science and Technology Entry Program, Felicia Lewis, the Associate Director for the Teachers Leaders Quality Partnership Program, and Martha Riordan, the Coordinator for the STEP program. The Defendant does not dispute that Nayak, Lewis, and Riordan were directly supervised by Dr. Robinson and subject to the same disciplinary standards as the Plaintiff.

Furthermore, in his affidavit in opposition to the instant motion, the Plaintiff also includes Sheree Morrison and Erica Williams as similarly situated female co-workers. The Plaintiff does not provide the Court with their job titles, job responsibilities, or any indication that they were also supervised by Dr. Robinson. Instead, the Plaintiff simply states that they were also "recently trained" in the Hofstra budget procedures. The Plaintiff's inclusion of Morrison and Williams is supported by documents in the record showing that they, along with the Plaintiff, Nayak, and Lewis, were instructed by Dr. Robinson to attend the training in Hofstra budget procedures. In the Defendant's Rule 56.1 Statement, the Defendant admits that this training was held for all of "the employees in CEAS who [were] responsible for a grant-funded program, including Plaintiff". (Def.'s Rule 56.1 Stmt., ¶ 9.) Thus. construing the record in the light most favorable to the Plaintiff, the Court finds that Morrison and Williams were also

directly supervised by Dr. Robinson and subject to the same disciplinary standards as the Plaintiff.

Although the Plaintiff has identified female comparators who were subject to the same disciplinary standards, the Plaintiff has failed to adduce any evidence from which a reasonable juror could infer that the Plaintiff was treated differently under these standards based on his gender. Similar to the Plaintiff, in the fall of 2008, his female comparators became responsible for preparing and monitoring the budgets of their respective programs. According to the Plaintiff, although his female comparators were more experienced in managing budgets, they also made "budgetary errors". Nevertheless, the Plaintiff contends that when he made an error, he was "the only person counseled, reprimanded, and subjected to countless memos and meeting[s] by Robinson". (Pl.'s Br. at 4.)

In particular, the record contains communications, reference to a meeting, and a memorandum all addressing the Plaintiff's failure to follow Hofstra budget procedures when ordering sweatshirts for CSTEP. Although Dr. Robinson approved the new logo for the sweatshirt, the Plaintiff admits that he "skipped a step" in the procedure that required him to obtain Dr. Robinson's approval on the purchase order prior to entering into the sweatshirt contract with The Frink Group. (12/3/2010 Bennett Dep., 135, 297; see also Bennett Aff., ¶ 2.) As a result, an order was placed that the CSTEP budget had insufficient funds to cover, resulting in CSTEP exceeding its budget by $3,000. The seriousness of this error was further compounded by the fact that Hofstra needed to obtain an additional allocation from the NYSED to cover the expense, and the delay in receiving this allocation, even if not entirely attributable to the Plaintiff, resulted in the imposition of a late fee and a threat of legal action.

By contrast, the Plaintiff states in a conclusory fashion that his female counterparts made "budgetary errors". This vague reference to "budgetary errors" in the Plaintiff's affidavit is insufficient to meet his burden in showing that his female comparators engaged in conduct of "comparable seriousness". The Second Circuit has held that to defeat a motion for summary judgment "nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted). At the summary judgment stage, the nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).

Here, the Plaintiff has presented no evidence beyond his own unsubstantiated assertion that Riordan, Nayak, Morrison, Williams, or Lewis made any errors at all, let alone errors of comparable seriousness. Furthermore, while the Plaintiff may dispute the circumstances giving rise to his April 24, 2009 mass email and his assertion in his April 27, 2009 email that he would not meet with Dr. Robinson without another individual present, he does not deny that he took these actions. It was this conduct that resulted in his termination, and the Plaintiff has not alleged, let alone provided evidentiary support, for the existence of any conduct of comparable seriousness by his female counterparts.

Thus, even taking all of the evidence in the best light for the Plaintiff, the Court finds that no reasonable jury could find that the Plaintiff has met his evidentiary burden in establishing a prima facie case with regard to showing circumstances that give rise to an inference of gender discrimination. As a result, the Court grants summary judgment in the Defendant's favor dismissing the plaintiff's Title VII and NYHRL gender discrimination claims.

**C. As to the Plaintiff's Retaliation Claims**

The Plaintiff also alleges that Hofstra terminated his employment in retaliation for his April 16, 2009 email to Dr. Robinson relaying concerns by CSTEP students about Dr. Robinson's treatment of them during the CSTEP Sagamore Conference.

Both Title VII and New York's Executive Law prohibit the firing of an employee in retaliation for their opposition to discriminatory practices.  Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1176 (2d Cir. 1996) (citing 42 U.S.C. § 2000e-3(a); N.Y. Exec. Law § 296(1)(e)).  To establish a prima facie case for employment retaliation, the Plaintiff must establish that (1) he "engaged in protected activity" (2) that Hofstra "was aware of this activity" (3) that Hofstra "took adverse action against him," and (4) "a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."  Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 177 (2d Cir. 2006) (internal quotations and citations omitted).  Where a plaintiff can establish a prima facie case, the analysis proceeds according to the McDonnell-Douglas framework.  See Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir. 1999) (noting that the burden-shifting framework applies to retaliation claims under Title VII).

With respect to the first element, a "'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).  This can include formal or informal complaints to management. Id. ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection"); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (protected activities include "making complaints to management").  However, in order to constitute a protected activity for purposes of a retaliation claim, the complaint must be

related to discrimination on a basis prohibited by Title VII.  See Amin v. Akzo Nobel Chem.,

Inc., 282 F. App'x 958, 961 (2d Cir. 2008); see also Braid v. MJ Peterson Corp., 208 F.3d 202

(2d Cir. 2000) (holding that the district court did not err in deciding not to charge the jury on the

plaintiff's retaliation claim because "[t]he sole evidence introduced by appellant to establish that

he had complained  . . . about race discrimination prior to his termination was a December 6,

1996 letter . . . [which] makes absolutely no mention, directly or indirectly, of race

discrimination or racial issues."); Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98

(2d Cir. 2011) ("The competent evidence in the record showed that any complaints Rojas made

were generalized and therefore the Diocese could not reasonably have understood that she was

complaining of "conduct prohibited by Title VII.").

Here, the parties dispute whether the Plaintiff's April 16, 2009 email to Dr. Robinson

constituted a "protected activity".   In the April 16, 2009 email the Plaintiff stated that he, as well

as CSTEP students, were offended that Dr. Robinson did not sit with them at the CSTEP

Sagamore Conference; that Dr. Robinson favored students from other schools over the CSTEP

students; and that Dr. Robinson made "disheartening remarks" to one of the student presenters.

(Rosenberg Decl., Ex. 20.)  As a result, the Plaintiff expressed that the students questioned

whether Dr. Robinson thought he was "too good" for them, and "felt [he] undermined and

act[ed] like they were not appreciated at all for being present".  (Id.)

Although the Plaintiff takes issue in the April 16, 2009 email with Dr. Robinson's

leadership skills as an "African-American[] in a leadership capacity", the Plaintiff admittedly

does not complain that Dr. Robinson in any way discriminated against the CSTEP students or the

Plaintiff on the basis of race, gender, or any other class protected by Title VII.  In fact, in the

Rebuttal Memorandum, the Plaintiff explicitly states that the purpose of the April 16, 2009 email

was not to protest unlawful discrimination, but "to express[] the student concerns" and "inform [Dr. Robinson] of the impact of [his] actions". (Rosenberg Decl., Ex. 21.)

In addition, at his deposition and in the Rebuttal Memorandum, the Plaintiff identified other "inappropriate behaviors" by Dr. Robinson that he purportedly complained about. For example, the Plaintiff testified that Dr. Robinson retaliated against him because he complained to Dr. Robinson with respect to his denial of requests by CSTEP students for certain programming; his refusal to timely pay students who were hired to do tutoring; and his behavior in turning off the lights and locking the door to their mutual office while the Plaintiff was meeting with a female student. (12/14/2010 Bennett Dep. 24–25.) As with the April 16, 2009 email, the Plaintiff does not assert that any of these complaints pertained to unlawful discrimination. Thus, a reasonable juror could not find that the April 16, 2009 email, or the Plaintiff's complaints about Dr. Robinson's conduct towards students, constituted "protected activity" for the purpose of establishing a prima facie case of retaliation.

Nevertheless, the Plaintiff argues that his complaints to Dr. Robinson about his inappropriate behavior constituted protected activity because, regardless of whether he can ultimately prevail on his gender discrimination claim, these complaints placed Dr. Robinson on notice that he "believed he was being treated differently for being a male based on Robinson's jealously of him and intimidation based on having less experience than his subordinate." (Pl.'s Opp. at 10.) The Second Circuit has held that "[a] plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (quoting Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.

1999)) (alteration in original).  "The reasonableness of the belief is to be assessed in light of the totality of the circumstances."  Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

The Plaintiff does not clearly articulate how complaining to Dr. Robinson about his conduct towards CSTEP students and his supervision of CSTEP generally is equivalent to complaining about gender discrimination.  A Plaintiff cannot create issues of fact to avoid summary judgment simply by failing to sufficiently articulate his position.  It may be that the Plaintiff believed that Dr. Robinson was behaving inappropriately towards the CSTEP students and program because of their association with the Plaintiff.  However, in light of the fact that the Plaintiff has not presented any evidence that Dr. Robinson treated the programs run by his female counterparts or the students within those programs differently, a reasonable jury could not find that such a belief was reasonable or in good faith.

Furthermore, even assuming the Plaintiff believed that the conduct he complained of was motivated by discrimination and therefore his complaints constituted protected activity, he would still fail to satisfy the second element of the prima facie case, namely, that Dr. Robinson, and therefore the Defendant, was aware of his protected activity.

"[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  Galdieri-Ambrosini, 136 F.3d at 292.  The Plaintiff detailed his objections to Dr. Robinson's performance in emails to Dr. Robinson; the April 18, 2007 and May 10, 2007 letters to Hofstra; the Rebuttal Memorandum, and the May 20, 2009 letter to the president of Hofstra.  These complaints are totally without reference, explicit or implicit, to any perceived gender discrimination.  In fact, in the Rebuttal

Memorandum, the Plaintiff expressly states that he believes Dr. Robinson's "actions are chronic signs of insecurity and lack of management skills in terms of directing [CEAS]". (Rosenberg Decl., Ex. 21.) Although the Plaintiff did raise the issue of gender discrimination with Dean Foulk in the April 27, 2009 meeting, the Plaintiff does not allege his termination was in retaliation for this statement. Nor does he allege that Dr. Robinson was aware of this statement.

Thus, the Court finds that the Plaintiff has failed to set forth a prima facie case of retaliation. Assuming the Plaintiff had a good faith, reasonable belief that he was the victim of discrimination on the basis of gender, he has failed to establish that there is a genuine issue of material fact with respect to whether Dr. Robinson understood, or reasonably could have understood, that his complaints were about gender discrimination. In sum, the Court finds that the Plaintiff has failed to raise a genuine issue of material facts as to the first and second elements of a prima facie case of retaliation. Accordingly, the Court grants the Defendant's motion for summary judgment and dismisses the Plaintiff's Title VII and NYHRL retaliation claims.

## III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 as to all causes of action is granted, and it is further

**ORDERED**, that the complaint is dismissed in its entirety, and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
February 3, 2012

___/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge